IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| J. WESTON LUNSFORD, an individual; and LAKE POWELL HOUSEBOAT OWNERS ASSOCIATION, INC., a non-profit corporation,<br><br>    Plaintiffs,<br><br>v.<br><br>UNITED STATES NATIONAL PARK SERVICE, a federal agency; CHARLES F. SAM, in his official capacity as Director, National Park Service; WILLIAM SHOTT, in his official capacity as outgoing Superintendent, Glen Canyon National Recreation Area; MICHELLE KERNS, in her official capacity as incoming Acting Superintendent, Glen Canyon National Recreation Area,<br><br>    Defendants. | **MEMORADUM DECISION AND ORDER DENYING PETITION FOR REVIEW OF AGENCY ACTION AND DENYING MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**<br><br>Case No. 2:22-cv-00543-RJS-DBP<br><br>Chief District Judge Robert J. Shelby<br><br>Chief Magistrate Judge Dustin B. Pead |

Before the court is Plaintiffs J. Weston Lunsford and Lake Powell Houseboat Owners' Association, Inc.'s (LPHOA) Petition for Review of Final Agency Action.[1] The Petition challenges Defendants United States National Park Service (NPS), Charles F. Sam, William Shott, and Michelle Kerns' administrative actions at Glen Canyon National Recreation Area

---

[1] ECF 41.

1

(GLCA). Also before the court is Plaintiffs' Motion to Supplement the Administrative Record with Extra-Record Evidence.[2]

For the following reasons, the court DENIES Plaintiffs' Petition without prejudice. The court DENIES Plaintiffs' Motion as moot.

## BACKGROUND

Plaintiffs in this case own houseboats stationed on Lake Powell,[3] the largest man-made lake in the United States and the centerpiece of Glen Canyon National Recreation Area (GLCA).[4] Their Petition challenges Defendants' May 2022 efforts to regulate "pin anchoring" in GLCA. Pin anchoring is the practice of anchoring a boat by drilling holes in the ground, inserting metal stakes or rebar "pins" into the holes, and fixing the boat to the metal stakes via rope lines.[5] A houseboat typically requires 4 to 8 pins to form a functional anchor, with each hole being 1.5–3.0 feet deep and 1–2 inches wide.[6]

The court briefly reviews the statutes and regulations governing GLCA before turning to the factual and procedural underpinnings of the case.

---

[2] ECF 36. Plaintiffs' Motion asks the court to supplement the Administrative Record with four Declarations—one provided by Lunsford and the remaining three provided by members of LPHOA. *See* ECF 36-1, *Declaration of Westin Lunsford*; ECF 36-2, *Declaration of Fraser Bullock*; ECF 36-3, *Declaration of Greg Warnock*; ECF 36-4, *Declaration of Chris Peterson*. The court considers the statements contained in Plaintiffs' Declarations solely for this Memorandum Decision and Order.

[3] *See, e.g.,* ECF 36-1 ¶ 11.

[4] Admin. R. at 1026, 1035, 1050.

[5] *Id.* at 1630.

[6] *Id.*

### I.      The National Park System and Glen Canyon National Recreation Area

Congress passed the NPS Organic Act in 1916.[7]  The Organic Act created the NPS and tasked the NPS with managing units of the National Park System.[8]  Specifically, the Organic Act directed the NPS to operate National Park System units consistent with the System's "fundamental purpose."[9]  That purpose is "to conserve the scenery, natural and historic objects, and wild life in the System units and to provide for the enjoyment of [the same] in such manner and by such means as will leave them unimpaired for the enjoyment of future generations."[10]  Congruently, the Organic Act authorized the NPS to promulgate regulations "necessary or proper for the use and Management of National Park System units."[11]

On October 27, 1972, Congress passed the Glen Canyon Enabling Act.[12]  The Enabling Act created GLCA as a unit of the National Park System and directed the NPS to "administer, protect, and develop the recreation area in accordance with the [NPS Organic Act] . . ."[13]  Beyond this command, Congress remarked that its intent in creating GLCA was "to provide for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto . . . ."[14]

---

[7] *See* Pub. L. No. 64-235, 39 Stat. 535 (1916).

[8] *Id.*; *see also* 54 U.S.C. § 100501.

[9] 54 U.S.C. § 100101(a).

[10] *Id.*

[11] *Id.* § 100751(a).

[12] *See* Pub. L. No. 92-593, 86 Stat. 1311 (1972) (codified at 16 U.S.C. § 460dd – 460dd-9). *See also* 54 U.S.C. § 100101(a)(b)(1).

[13] *See* 16 U.S.C. § 460dd-3 (citation omitted). *See also* 54 U.S.C. § 100101(b)(1).

[14] 16 U.S.C. § 460dd(a).  Historically, NPS has managed GLCA to allow for a wide variety of recreational activities. *Compare* Admin. R. at 339 (anticipating that GLCA would host recreational activities including hunting, hiking, camping, picnicking, horseback riding, swimming, backpacking, canoeing, kayaking, bicycling, scenic touring, speedboating, water skiing, fishing, sailboating, houseboat touring, river rafting, trail bike riding, and dune buggy driving) *and* National Park Service, *Things to Do*, Glen Canyon National Recreation Area (Jan. 25, 2024), https://www.nps.gov/glca/planyourvisit/things2do.htm.

## II. NPS Regulations

In 1983, acting pursuant to its authority under the Organic Act, the NPS enacted a set of regulations for National Park System units (the General Regulations).[15] The General Regulations established a framework for "managing public use and recreation activities (e.g. camping, fishing, hunting, winter activities, boating) in areas administered by the [NPS]."[16] Several of these regulations, as amended and supplemented, are relevant to this case.

First, 36 C.F.R. § 2.1(a)(1)(iv) prohibits "[p]ossessing, destroying, injuring, defacing, removing, digging, or disturbing from its natural state" a "mineral resource or cave formation or the parts thereof."[17] Second, 36 C.F.R. § 2.31(a)(3) prohibits "[v]andalism," defined as "[d]estroying, injuring, defacing, or damaging property or real property."[18] Both restrictions broadly apply to National Park System units.[19] Third, 36 C.F.R. § 7.70 contains special rules applicable only to GLCA. These rules were promulgated alongside special regulations for other National Park System units and intended to "amend, modify, relax or make more stringent" generally appliable regulations such as Sections 2.1 and 2.31.[20] For example, Section 7.70 designates areas where individuals may launch personal watercraft, prohibits pets from joining

---

[15] 48 Fed. Reg. 30252, 30252 (June 30, 1983).

[16] *Id.*

[17] *Id.* at 30282.

[18] *Id.*

[19] *See* 36 C.F.R. § 1.2(a); *see also* 48 Fed. Reg. 30252, 30275 (June 30, 1983). In combination, Sections 2.1 and 2.31 replaced an existing regulation which prohibited the "possession, destruction, injury, defacement, removal or disturbance in any manner of . . . any building, sign, equipment, monument, statute, marker, or other structure . . . or of any soil, rock, mineral formation, phenomenon of crystallization . . . or any other public property of any kind . . . " in the "natural and historical areas" of NPS units. *See* 31 Fed. Reg. 16650, 16652 (1966).

[20] 36 C.F.R. § 1.2(c); *see also* 48 Fed. Reg. 30252, 30275 (June 30, 1983).

4

Colorado River rafting trips, and limits how fast GLCA visitors may drive off-road vehicles.[21] Section 7.70 does not contain provisions specifically governing houseboating or anchoring.

### III. NPS Efforts to Combat Pin Anchoring

Since at least early 2015, pin anchoring has been a point of contention between Lake Powell houseboaters and NPS officials.[22] Although houseboaters viewed pin anchoring as a "common and accepted practice" essential to houseboat recreation,[23] the NPS viewed pin anchoring as a violation of federal law.[24] Accordingly, the NPS engaged in active law enforcement and public education efforts to stop pin anchoring.[25]

The origins of the present conflict date to approximately May 2019. Around that time, Defendants learned the prevalence of pin anchoring had substantially increased during the preceding years.[26] Defendants became worried their traditional enforcement efforts were proving ineffective and began developing a new program to combat pin anchoring.[27]

---

[21] *See* 36 C.F.R. § 7.70.

[22] *See, e.g.*, Admin. R. at 67–68 (January 2015 letters from NPS to GLCA concessionaires expressing NPS's concern concessionaires were providing pin anchoring services in violation of federal law).

[23] *See* ECF 36-1 ¶¶ 10–12, 16 (asserting that from 2004 to May 2022, Plaintiff Lunsford "always used 'pinning' as a method to anchor [his] houseboat" and perceived pin anchoring as "a common and accepted practice"). *See also* ECF 36-2 (describing personal observations of pin anchoring from 2012 to 2022); ECF 36-3 (describing personal observations of pin anchoring from 2012 or 2013 to 2022).

[24] *See e.g.*, Admin. R. at 105–07 (July 2018 email from GLCA Chief Ranger informing a visitor that pin anchoring is illegal under 36 C.F.R. §§ 2.1 and 2.31).

[25] *See, e.g.*, *id*. at 1386–91 (October 2016 NPS incident report describing encounter between law enforcement officer and three concessionaire employees engaged in pin anchoring who presented a copy of a 2006 email exchange initiated by a third party as a pin anchoring "permit"); *id.* at 1392–1529 (post-2015 examples of NPS law enforcement citing houseboaters engaged in pin anchoring for destroying or disturbing mineral resources in violation of 36 C.F.R. § 2.1; *id* at 1411–13 (2017 NPS report asserting that in August 2017 NPS published a website to "educate visitors about houseboat anchoring" which "expressly advise[d] visitors that drilling is illegal").

[26] *Id.* at 1411–13 (NPS report asserting that "the incidence of rock drilling for vessel anchoring [] increased exponentially" during 2016 and 2017); *id.* at 1537–60 (2018 NPS survey describing a "significant increase" in pin anchoring "over the last 2–3 years").

[27] *Id.* at 1787.

The program, finalized in August 2021 and titled Project 100811, "Institution of Alternative Anchoring Pilot Program," involved permitting existing NPS concessionaires to perform limited pin anchoring services for up to three years, while NPS studied the impacts of pin anchoring and educated the public on resource preservation.[28]  Such permissions aside, Project 100811 specified that "pin anchoring activity by the general public would continue to not be authorized . . . ."[29]

The NPS abandoned Project 100811 in January 2022 when its primary concessionaire partner, Antelope Point Marina, expressed concern over the environmental impacts of pin anchoring and informed NPS that it intended to pursue an alternative partnership with Beach Bags, LLC.[30]  Beach Bags had developed a non-traditional houseboat anchoring system in which rope lines fixed houseboats to large, colorful water bags laid on shore.[31]  Relatedly, in December 2021, Beach Bags had applied for and received a two-year commercial use authorization (CUA) to provide its non-traditional anchoring services in GLCA.[32]

In place of Project 100811, NPS developed a new program focused on the use of non-traditional anchor systems like Beach Bags.[33]  The new program, titled Project 107848, "Institution of Short Term CUA for Alternative Anchoring Pilot Program," involved granting CUAs to vendors offering such systems and permitting those vendors to supplement their anchor

---

[28] *Id.* at 1585–86.

[29] *Id.*

[30] *Id.* at 1768.  In December 2019, Beach Bags expressed interest in partnering with the NPS to offer its system as a non-destructive alternative to other anchoring methods and the entities began discussing the possibility of forming such a partnership.  *Id.* at 96–98, 108, 131–33, 146–47, 213, 233–35, 1651–56.  However, no partnership came to fruition prior to NPS's efforts to carry out Project 107848.

[31] *See, e.g.*, *id.* 1563–66.

[32] *Id.* at 7–28, 55, 56.

[33] *Id.* at 1611–16.

6

systems with pin anchors in certain circumstances.[34] The pin anchors, described as "back pins," could only be used as an "emergency fail safe," on boats over 75 feet, in certain areas of GLCA, and for a trial term of no more than six months.[35]

Throughout late April and May 2022, Defendant Shott, GLCA's Superintendent, took steps to implement Project 107848. First, on May 10, 2022, Shott authorized a six-month addendum to Beach Bags' existing CUA allowing Beach Bags to "back pin" its water bag anchors subject to the limitations outlined in Project 107848.[36] Second, on May 26, 2022, Shott, authorized the addition of the following language to GLCA's *Superintendent's Compendium Of Designations, Closures, Permit Requirements and Other Restrictions Imposed Under Discretionary Authority* (Compendium):

> **Pin Anchoring – Prohibited**
> Pin Anchoring within Glen Canyon National Recreation Area is not allowed unless specifically stated within a commercial use authorization.[37]

IV. **Procedural History**

In August 2022, Plaintiffs filed their Petition, requesting the court's review of (1) Defendants' decision to authorize Beach Bags' CUA addendum and (2) Defendants' decision to revise the Compendium.[38] Characterizing Defendants' decisions as imposing a new ban on pin anchoring and forcing houseboaters to employ Beach Bags, Plaintiffs allege Defendants'

---

[34] *Id.*

[35] *Id.*; *see also id.* at 53–54, 1617–35.

[36] *Id.* at 53–54.

[37] *Id.* at 69, 71.

[38] *See, e.g.*, ECF 41 at 2 ("Plaintiffs challenge Superintendent Shott's May 2022 decision to add a rule to his Superintendent's Compendium that prohibits pin anchoring houseboats, except under a commercial use authorization he contemporaneously granted to Beach Bags.").

7

impaired their safe use and enjoyment of Lake Powell and created an increased risk of harm to their interest in preserving GLCA's natural environment.[39]

## LEGAL STANDARDS

"Article III of the [United States] Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"[40] "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish . . . they have standing to sue.'"[41]

An individual has standing to sue when: (a) they suffer "injury in fact;" (b) which is "fairly traceable" to a defendant's actions; and (c) their injury will likely be "redressed" by a favorable decision from the court.[42] Injury in fact occurs when a party suffers an invasion of a legally protected interest which is both concrete and particularized, and actual or imminent, not conjectural or hypothetical.[43]

An organization suing on behalf of its members has standing when: "(a) its members would have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[44]

"The party invoking federal jurisdiction bears the burden of establishing these elements" and must do so by presenting affidavits or other evidence containing "specific facts" in support

---

[39] *See, e.g.*, ECF 36-1 ¶¶ 3–4, 24–31, 36–37, 40–41.

[40] *Clapper v. Amnesty Int'l. USA*, 568 U.S. 398, 408 (2013).

[41] *Id.*

[42] *Bennett v. Spear*, 520 U.S. 154, 162 (1997); *see also Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831, 840 (10th Cir. 2019).

[43] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

[44] *Dine*, 923 F.3d at 840 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

of each element.⁴⁵ Although the court is bound to accept these specific facts as true for purposes of its standing analysis, it need not accept as true "conclusory allegations, unwarranted inferences, or legal conclusions."⁴⁶

## ANALYSIS

Plaintiffs' Petition requests review of Defendants' May 2022 decisions subject to the judicial review provisions of the Administrative Procedures Act, asserting four claims that Defendants' decisions were arbitrary, capricious, and an abuse of discretion.⁴⁷ Defendants argue Plaintiffs lack standing to assert these claims because they fail to allege specific facts evidencing injury in fact.

Plaintiff Lunsford and individual members of Plaintiff LPHOA allege two broad categories of injuries to their personal interests. First, they allege Defendants' actions hindered their ability to enjoy safe, convenient, and low-cost houseboat recreation on Lake Powell. Second, they allege Defendants' actions created an increased risk of actual, threatened, or imminent environmental harm to GLCA. As explained below, neither of these injuries constitute injury in fact. Accordingly, the court agrees with Defendants' position that Plaintiffs lack standing to sue.⁴⁸

---

⁴⁵ *Lujan*, 504 U.S. at 561; *see also Dine*, 923 F.3d at 840 (applying the standard for evaluating standing at the summary judgment stage to a Petition for Review of Agency Action).

⁴⁶ *State of Utah v. Babbitt*, 137 F.3d 1193, 1207 n. 20 (10th Cir. 1998) (quoting *Hackford v. Babbitt*, 14 F.3d 1457, 1465 (10th Cir. 1994)).

⁴⁷ *See* 5 U.S.C. §§ 701–06.

⁴⁸ Defendants also allege they suffered injury when Defendants failed to follow procedural processes prescribed by 36 C.F.R § 1.5(b) and the National Environmental Protection Act (NEPA). However, procedural injuries alone are insufficient to establish injury in fact. *Lujan*, 504 U.S. at 571–74; *see also Summers v. Earth Island Inst.*, 55 U.S. 488, 496 (2009).

### I. Plaintiffs Do Not Allege Specific Facts Evidencing Injury in Fact to Their Recreational Interests.

Plaintiffs first allege that they suffered injury in fact "when NPS . . . abruptly ban[ned] the existing pin anchoring practices on which they had relied to safely anchor their houseboats in [GLCA] and thereby significantly restricted their existing houseboating use."[49] Expanding on this injury, Plaintiffs allege that "[t]hey could only obtain pin anchoring to safely anchor their houseboats against high winds by also paying thousands of dollars above and beyond the typical cost of pin anchoring for Beach Bags to install alternative 'beach bag' anchors that had not been third party tested and established to be safe and effective."[50]

Defendants argue these allegations do not evidence injury in fact since they are premised on Plaintiffs' inability or reduced ability to pin anchor their houseboats.[51] Defendants reason their May 2022 actions did not "ban" pin anchoring and Plaintiffs suffered no associated harm because pin anchoring in GLCA was already illegal under federal law.[52] Because Plaintiffs do not suffer injury in fact if they lacked a legally protected right to pin anchor, the court begins its analysis by assessing pin anchoring's legality prior to Defendants' May 2022 actions.[53]

---

[49] ECF 41 at 24 (emphasis added). *See also* ECF 36-1 ¶ 42; ECF 36-2 ¶ 25; ECF 36-3 ¶¶ 18–20, 24; ECF 2, *Complaint* ¶¶ 7–8.

[50] ECF 41 at 24 (emphasis added). *See also* ECF 36-1 ¶¶ 36–37; ECF 36-2 ¶¶ 20–23; ECF 36-3 ¶¶ 15–17; ECF 2 ¶¶ 7–8.

[51] *See, e.g.*, ECF 47, *Defendants' Answer Brief* at 11.

[52] *Id.*

[53] The court recognizes its analysis of pin anchoring's legality could implicate the merits of Plaintiffs' claims. Concurrently, the court recognizes the long-standing judicial principle that Plaintiffs need not prove the merits of their claims in order to establish standing. *See, e.g.*, *Dine*, 923 F.3d at 841 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). In this case, however, the court concludes determining the legal status of pin anchoring is essential to its ability to conduct a proper standing analysis. The court must establish whether pin anchoring was legal in order to determine whether Plaintiffs' injury relates to an interest founded in law and eligible for judicial enforcement, or an invalid desire to engage in criminal activity. *See Babbitt*, 137 F.3d at 1207; *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1236 (10th Cir. 2004); *Initiative and Referendum Inst. v. Walker*, 450 F.3d 1082, 1093 (10th Cir. 2006); *Day v. Bond*, 500 F.3d 1127, 1138–39 (10th Cir. 2007).

### A. Pin Anchoring Is Illegal Under 36 C.F.R. §§ 2.1 and 2.31.

The court first considers Defendants' contention that 36 C.F.R. §§ 2.1 and 2.31, enacted in 1983 and applicable to "all persons entering, using, visiting, or otherwise within" the "boundaries of federally owned lands . . . administered by the National Park Service,"[54] prohibited pin anchoring in GLCA prior to Defendants' May 2022 actions.

In interpreting a federal regulation, the court begins by inspecting its text and "giving each word its ordinary and customary meaning."[55]  If the regulation's meaning is clear after such an examination, the court must apply the regulation's plain meaning.[56]  If any doubt remains as to the regulation's meaning, the court may also examine the regulation's history, structure, and purpose.[57]  If these extra-textual sources clarify the regulation's meaning so as to make the regulation unambiguous, the court's analysis is complete.[58]

Reviewing the plain language and extra-textual context of Sections 2.1 and 2.31, the court concludes both regulations prohibit pin anchoring in GLCA.

### 1. The Plain Language of Section 2.1 Prohibits Pin Anchoring.

The plain language of Section 2.1(a)(1)(iv) prohibits "[p]ossessing, destroying, injuring, defacing, removing, digging, or disturbing from its natural state" a "mineral resource."  Title 36 does not define these terms or otherwise direct their interpretation.  However, both Plaintiffs and Defendants acknowledge pin anchoring involves permanently altering the rock walls and

---

[54] 36 C.F.R. § 1.2(a).

[55] *Scalia v. Wynnewood Refining Co.*, 978 F.3d 1175, 1181 (10th Cir. 2020).

[56] *Id.*

[57] *Id.*

[58] *Id.*; *see also Kisor v. Wilkie*, 139 S. Ct 2400, 2415–16 (2019) ("[I]f the law gives an answer—if there is only one reasonable construction of a regulation—then a court has no business deferring to any other reading . . . .").

11

shoreline of Lake Powell by drilling holes and inserting metal stakes into them.[59] And the parties do not dispute rocks are a natural resource composed of mineral parts. By ordinary and custom meaning, then, the plain language of Section 2.1 prohibits pin anchoring.

### 2. The Plain Language of Section 2.31 Prohibits Pin Anchoring.

Similarly, the plain language of Section 2.31(a)(3) prohibits "[v]andalism," defined as "[d]estroying, injuring, defacing, or damaging property or real property." As discussed in the preceding paragraph, the parties agree pin anchoring involves permanently altering the rock walls and shoreline of Lake Powell by drilling holes and inserting metal stakes into them.[60] Because these geographic features are the United States' real property, the plain language of Section 2.31 also prohibits pin anchoring.

### 3. The Extra-Textual Context of 36 C.F.R. §§ 2.1 and 2.31 Confirms the Court's Conclusions Regarding the Regulations' Plain Language.

Although the plain language of Sections 2.1 and 2.31 unambiguously prohibit pin anchoring in GLCA, the court notes the regulations' history, structure, and purpose bolster this conclusion.

In brief review, GLCA's history began in 1972 when Congress created it as a unit of the National Park System.[61] Thereafter, the NPS promulgated Sections 2.1 and 2.31 as broadly applicable regulations governing recreation in National Park System Units.[62] Although the General Regulations, as amended and supplemented, also contain GLCA-specific regulations affecting Sections 2.1 and 2.31, the GLCA-specific regulations do not discuss houseboating or

---

[59] *See, e.g.*, ECF 41 at 2; ECF 47 at 5.

[60] *See, e.g.*, ECF 41 at 2; ECF 47 at 5.

[61] *See* Pub. L. No. 92-593, 86 Stat. 1311 (1972) (codified at 16 U.S.C. § 460dd – 460dd-9).

[62] *See* 36 C.F.R. § 1.2(a); *see also* 48 Fed. Reg. 30252, 30275 (June 30, 1983).

anchoring.[63] Likewise, although Section 2.1 itself contains exceptions for certain activities, it does not contain exceptions for houseboating or anchoring.[64] In combination, this history and structure do not suggest the NPS meant to allow pin anchoring.

The NPS's justifications for enacting Sections 2.1 are similarly informative. Discussing its choice of language in Section 2.1, the NPS articulated its intent to expansively protect natural resources in accord with the NPS Organic Act:

> "The [NPS] believes that the use of broad, generic terms is a better way to provide resource protection. It is the intent [of] this regulation to protect all natural, cultural, and archeological resources within park areas to leave them unimpaired for the enjoyment of future generations. The listing of specific terms, the Service believes, invites the risk of omitting one, and weakens protection of park resources through a technical omission."[65]

Against the backdrop of the regulation's plain language, history, and structure, this conservation-focused intent does not comport with the notion pin anchoring is exempt from Section 2.1.

### B. Plaintiffs Arguments' Do Not Negate Sections 2.1 and 2.31's Applicability.

Plaintiffs' do not directly challenge Defendants' argument that pin anchoring is illegal under 36 C.F.R. §§ 2.1 and 2.31 and, instead, argue the General Regulations do not or should not apply to GLCA.

---

[63] *See e.g.*, 36 C.F.R. § 7.70. Plaintiffs contend Defendants' failure to regulate pin anchoring under 36 C.F.R. § 7.70 makes pin anchoring legal. *See, e.g.*, ECF 2 ¶ 33. However, this argument inverts the structure of the General Regulations, which impose widely applicable policies subject to specific exceptions. *See* 36 C.F.R. § 1.2(c).

[64] *See* 36 C.F.R. § 2.1(b)–(c).

[65] 48 Fed. Reg. 30252, 30255 (June 30, 1983).

For example, Plaintiffs contend Sections 2.1 and 2.31 do not apply to GLCA because GLCA's recreation mandate overrides them.[66] However, Congress' intent in designating GLCA as a recreation hub is not expressly or impliedly inconsistent with the General Regulations, which anticipate recreation and resource protection as mutually inclusive activities.[67] Plaintiffs alternatively suggest the General Regulations do not apply specifically to the practice of pin anchoring in GLCA because Congress intended for GLCA to host recreational houseboaters, and therefore anticipated pin anchoring would occur.[68] However, Plaintiffs do not specifically identify any discussion of houseboating or pin anchoring in GLCA's Enabling Act and the associated legislative history. Nor do they present any other authority to support their argument.[69]

At other times, Plaintiffs rely on the factual record to suggest Sections 2.1 and 2.31 should not apply to pin anchoring because GLCA officials at times permitted or tolerated pin anchoring.[70] The factual record Plaintiffs cite is not relevant to the legal question of whether pin

---

[66] *See, e.g.*, ECF 41 at 6–7; ECF 53, *Plaintiffs' Reply Brief* at 20.

[67] *Compare* 16 U.S.C. § 460dd ("In order to provide for public outdoor recreation use and enjoyment of Lake Powell and lands adjacent thereto in the States of Arizona and Utah and to preserve scenic, scientific, and historic features contributing to the public enjoyment of the area, there is established [GLCA] . . . ") *with* 36 C.F.R. § 1.1(b) (describing the purpose of the General Regulations as "provid[ing] for the proper use, management, government, and protection of persons, property, and natural and cultural resources within areas under the jurisdiction of [NPS]").

[68] *See, e.g.*, ECF 41 at 2–3.

[69] Plaintiffs' briefing notes a single reference to houseboating in GLCA's 1979 General Management Plan. *See, e.g.*, ECF 2 ¶¶ 26–34. The reference lists houseboating as one of many recreational activities anticipated at GLCA. Admin. R. at 339.

[70] ECF 41 at 30–31; *see also* ECF 53 at 1–4.

anchoring violates Sections 2.1 and 2.31.[71] And in any case, the facts Plaintiffs cite are equivocal. They do not demonstrate when or how GLCA officials formally permitted pin anchoring, nor when or how GLCA officials changed their position.[72]

Alone or in combination, Plaintiffs' arguments do not negate the applicability and meaning of Sections 2.1 and 2.31. Pin anchoring houseboats in GLCA is and has been illegal since before Defendants May 2022 actions.

Because pin anchoring was illegal prior to May 2022, the court concludes Plaintiffs do not have a legally protected interest in pin anchoring their houseboats. Accordingly, injury in fact to their recreational interests in Lake Powell houseboating does not flow from their inability or reduced ability to pin anchor after May 2022.

## II. Plaintiffs' Do Not Allege Specific Facts Evidencing Injury in Fact to Their Interests in GLCA's Natural Environment.

Plaintiffs also allege they suffered injury because Defendants May 2022 actions "fail[ed] to follow NEPA's procedures, creating an increased risk of 'actual, threatened or [imminent]

---

[71] In the merits section of their Petition, Plaintiffs cite several cases involving the NPS's efforts to prohibit off-leash dogs in Golden Gate National Recreation Area (GGNRA), including *United States v. Barley*, 405 F.Supp.2d 1121 (N.D. Cal. 2005). *See* ECF 41 at 30. Plaintiffs suggest, subject to *Barley*, a National Park Service unit may not enforce a prohibition established by the General Regulations without engaging in notice and comment rulemaking when the unit has, as a matter of fact, allowed a prohibited activity to occur. *See* ECF 41 at 30. However, *Barley* is distinguishable from the present case in that GGNRA's local Compendium contained a rule specifically allowing off-leash dogs. *Barley*, 405 F.Supp.2d at 1122. This rule supplemented a longstanding formal policy allowing off-leash dogs, adopted at the time of GGNRA's inception and with "considerable input" from GGNRA's advisory commission. *Id.*

[72] For example, Plaintiffs' briefing cites a 2018 letter from the NPS to Lake Powell concessionaires to demonstrate the concessionaires provided pin anchoring services "with NPS knowledge and implicit acceptance." ECF 53 at 3. However, the NPS began the quoted letter by stating "[t]his letter is a reminder that the practice of 'pin anchoring' to anchor houseboats is not currently an authorized service . . . " and "a violation of federal law." Admin. R. at 58–59. As another example, Plaintiffs repeatedly refer to the unverified 2006 email exchange produced as a "permit" in a 2016 interaction between pin anchorers and law enforcement as clear evidence the NPS endorsed pin anchoring. *See* ECF 41 at 8–9. However, Plaintiffs give little attention to the unusual context in which the email came to light. *Compare id.* and ECF 53 at 1–2 *with* Admin R. at 1383–85, 1390–91.

The Plaintiffs' Declarations describing firsthand accounts of pin anchoring from 2004–2022 do not offer better support for their contentions because they only describe observations of pin anchoring, not the law governing the practice. *See, e.g.*, ECF 36-1 ¶ 16. Plaintiffs' assertions that they understood pin anchoring to be permitted by NPS do not cure this issue because they do not identify any foundation for their beliefs. *Id.*

15

environmental harm'" to their interests in maintaining GLCA's natural environment.[73] Explaining this injury, Plaintiffs describe environmental harms associated with Beach Bags' water bag anchors: the visual impact of the colorful bags against Lake Powell's red rock landscape, overuse and overcrowding in shoreline areas well-suited to the bags, and the effect of pumping water in and out of Lake Powell to fill and empty the bags on fish spawning and shoreline erosion.[74] Defendants argue Plaintiffs' allegations do not evidence injury in fact because these environmental harms are independent of the challenged agency action.[75] The court agrees.

To establish concrete and particularized injury in fact as it relates to a federal agency's disregard of NEPA procedures, a plaintiff must satisfy two requirements. First, a plaintiff must set forth specific facts showing an agency action created an increased risk of actual, threatened, or imminent environmental harm.[76] A plaintiff need not prove the merits of their claims, but must establish a connection between an agency's allegedly uninformed decisionmaking and an increased risk of environmental harm.[77] Next, a plaintiff must "show that the increased risk of environmental harm injures its concrete interests by demonstrating either their geographical nexus to, or actual use of, the site of the agency action."[78]

Often, the first requirement is easily satisfied. For example, in *Committee to Save the Rio Hondo v. Lucero*, the Tenth Circuit readily found sufficient facts to connect an agency's decision to authorize new operations at a ski area to an increased risk of environmental harm when

---

[73] ECF 41 at 24–25.  *See also Dine*, 923 F.3d at 840.

[74] ECF 41 at 16; ECF 53 at 11. *See also* ECF 36-1 ¶¶ 40–41; ECF 36-2 ¶¶ 24, 26; ECF 36-3 ¶¶ 22–23, 25.

[75] *See* ECF 47 at 13–14.

[76] *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir. 2019).

[77] *See, e.g.*, *id.* at 450; *Dine*, 923 F.3d at 840.

[78] *Comm. To Save the Rio Hondo*, 102 F.2d at 449.

plaintiffs alleged the new operations would result in increased mechanization and visitation.[79] Plaintiffs claimed mechanization and visitation would harm a nearby river by driving water consumption, increasing sewage discharge, and worsening pollution.[80] They also claimed the new operations would increase overall development, disturbing the recreational and aesthetic value of the land in and around the ski area.[81] The court in *Dine Citizens Against Ruining Our Environment v. Bernhardt* similarly found plaintiffs "sufficiently tied" an agency's decision to approve new oil and gas wells on public land to an increased risk of environmental harm when they alleged the wells stimulated new industrial development.[82]

Here, by contrast, Plaintiffs do not identify facts naturally connecting Defendants' May 2022 actions to an increased risk of environmental harm. Plaintiffs argue Defendants exacerbated the environmental impacts associated with Beach Bags' water bag anchors because their May 2022 decisions banned pin anchoring, thereby "mandating" houseboaters' use of water bag anchors.[83] However, as previously explained, Defendants' 2022 actions did not ban pin anchoring. Pin anchoring was illegal under 36 C.F.R. §§ 2.1 and 2.31 before Defendants' challenged actions occurred.

Likewise, Defendants issued Beach Bags a CUA authorizing it to provide anchoring services using its water bag anchors in December 2021.[84] This decision was separate from and unrelated to Defendants' May 2022 decisions.[85] Those decisions—adding a Compendium rule

---

[79] *Id.* at 450.

[80] *Id.*

[81] *Id.*

[82] *Dine*, 923 F.3d at 840–41.

[83] *See, e.g.*, ECF 41 at 16; ECF 53 at 14–15. Plaintiffs admit they "do not seek to ban all use of Beach Bags." ECF 53 at 15.

[84] Admin. R. at 53.

[85] *Compare id.* at 53 *and* 55.

prohibiting pin anchoring without express authorization and granting an addendum to Beach Bags' existing CUA allowing it to "back pin" its water bag anchors—did not alter Beach Bags' existing authority to provide alternative anchoring services.[86] Absent any association between Defendants' May 2022 decisionmaking and the environmental impacts of Beach Bags' water bag anchors, Plaintiffs do not explain how Defendants created an increased risk of actual, threatened, or imminent environmental harm. Plaintiffs do not establish injury in fact based on their interest in maintaining GLCA's natural environment.

In sum, each of Plaintiffs' alleged injuries rely on their legal conclusion that Defendants' 2022 actions altered the status quo by outlawing pin anchoring in GLCA. However, Plaintiffs misstate the law at that time and, thus, the impact of Defendants' actions. Accordingly, Plaintiffs do not meet their burden to demonstrate standing and the court lacks jurisdiction to consider the merits of their claims.

## CONCLUSION

For the reasons stated, the court DENIES Plaintiffs' Petition for Review of Agency Action[87] without prejudice. Additionally, the court DENIES Plaintiffs Motion to Supplement the Administrative Record With Extra-Record Evidence[88] as moot.

SO ORDERED this 18th day of March 2024.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[86] *Id.*

[87] ECF 41.

[88] ECF 36.